IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAMONT HAGAN,** | : | CIVIL ACTION NO. 1:19-CV-2120 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **BERNADETTE MASON, STETLER,** | : | |
| **BANTA, MILLER, GROHOWSKI,** | : | |
| **CONTRERAS, KLICK, HUBER,** | : | |
| | : | |
| Defendants | : | |

## **MEMORANDUM**

Plaintiff Damont Hagan ("Hagan"), an inmate who was housed at all relevant times at the State Correctional Institution at Retreat, Pennsylvania ("SCI-Retreat"), commenced this action pursuant to 42 U.S.C. § 1983 alleging that defendants retaliated against him in violation of his First Amendment rights. (Doc. 1). Named as defendants are Superintendent Bernadette Mason, Deputy Superintendent Stetler, Deputy Superintendent Banta, Corrections Classification Program Manager Miller, Unit Manager Grohowski, Lieutenant Contreras, Lieutenant Klick, and Correctional Officer Huber. Hagan moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 26). For the reasons set forth below, the court will deny the motion.

I. **Factual Background & Procedural History**[1]

Hagan alleges that from December 2018 through February 2019 he filed several meritorious grievances. (Doc. 1 ¶ 9). In retaliation for filing these grievances, Hagan alleges, *inter alia*, that defendants converted a misconduct from informal resolution to a formal misconduct, placed him into Phase 4 of the Behavioral Management Unit ("BMU"), and extended his disciplinary time until August 2027. (Id. ¶ 39 (count I), ¶ 42 (count IV), ¶ 43 (count V)).

A. **Material Facts Regarding Protective Conduct**

On January 10, 2019, a grievance filed by Hagan was found to be meritorious and upheld in his favor. (Doc. 27 ¶ 1; Doc. 51 ¶ 1). On January 2, 2019, a grievance filed by Hagan was upheld in part and denied in part. (Id. ¶ 2; Doc. 27 at 15). On February 4, 2019, a grievance filed by Hagan was upheld in part and denied in part. (Doc. 27 ¶ 3; Doc. 51 ¶ 3; Doc. 27 at 16).

On February 14, 2019, a hearing examiner dismissed a misconduct charge issued against Hagan. (Doc. 27 ¶ 4; Doc. 51 ¶ 4; Doc. 27 at 17).

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts and exhibits. (See Docs. 27, 51, 52). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

On March 22, 2019, Hagan filed two grievances against staff which were received by the Facility Grievance Coordinator on March 26, 2019. (Doc. 27 ¶¶ 5, 6; Doc. 51 ¶¶ 5, 6; Doc. 27 at 18-21).

Hagan filed a grievance against defendant Stetler wherein he asserted that Stetler informed him that he would be placed back into Phase 4 of the BMU, and stated: "Enjoy your stay Hagan, you'll file your grievances from here from now on." (Doc. 27 ¶¶ 7, 30; Doc. 51 ¶¶ 7, 30; Doc. 27 at 22). Defendants deny that Stetler made such a statement. (Doc. 51 ¶¶ 7, 30).

As of February 5, 2019, defendant Mason was aware that Hagan was engaged in filing meritorious grievances. (Doc. 27 ¶ 8; Doc. 51 ¶ 8; Doc. 27 at 23). Defendants deny that Stetler and Banta were aware of the filing of such grievances. (Doc. 51 ¶ 8).

From February 2019 to March 2019, Hagan filed other forms of complaints such as letters to Central Office, request slips and letters to the Governor's office. (Doc. 27 ¶ 9; Doc. 51 ¶ 9).

**B.     Material Facts Regarding Adverse Actions**

On February 12, 2019, a misconduct was issued against Hagan charging him with lying to an employee, which he classifies as a "false" misconduct. (Doc. 27 ¶ 10; Doc. 51 ¶ 10; Doc. 27 at 27). The misconduct was referred to the Program Review Committee ("PRC") based on the seriousness of the issue. (Id.) Due to PRC's decision to make the misconduct formal, Hagan was placed in the BMU, which is an isolation unit. (Doc. 27 ¶ 11; Doc. 51 ¶ 11). Hagan contends that he was placed in one cell with dried feces on the walls and bedframe, dried blood on the side walls,

3

and oleoresin capsicum ("OC") chemicals on the desk and walls. (Doc. 27 ¶ 11; Doc. 27 at 28-29). Defendants deny that the cell was in such a condition. (Doc. 51 ¶ 11). Defendants assert that Hagan was placed in cell GA 1008 on February 12, 2019, the cell was cleaned thoroughly and painted on February 8, 2019, and no inmate was housed in that cell from February 8, 2019 to February 12, 2019, when Hagan was placed in the cell. (Doc. 51 ¶ 11; Doc. 52-2).

Hagan contends that defendants Banta and Stetler are members of the PRC and did not personally check the BMU cell before Hagan was placed in the cell. (Doc. 27 ¶ 12). He further contends that Stetler and Banta know that inmates in the BMU smear feces on a regular basis. (Id.)

On February 13, 2019, Hagan appeared before defendants Banta and Stetler for an administrative hearing wherein he alleged that a false misconduct was issued against him. (Doc. 27 ¶ 13; Doc. 51 ¶ 13; Doc. 27 at 30). Hagan contends that he presented evidence establishing that the misconduct was false. (Doc. 27 ¶ 13).

On March 22, 2019, a misconduct was issued against Hagan charging him with threatening an employee, refusing to obey an order, and using abusive language. (Doc. 27 ¶¶ 14, 15; Doc. 51 ¶¶ 13, 15; Doc. 27 at 31-32). Hagan avers that two of the charges were false and resulted in his placement in the BMU. (Doc. 27 ¶ 13).

On March 27, 2019, Hagan was placed back in Phase 4 in the BMU, which is a very restricted phase, and was given a document indicating that he would be in disciplinary time until August 16, 2027. (Doc. 27 ¶ 16; Doc. 51 ¶ 16; Doc. 27 at 33-35). On April 23, 2019, Hagan received an Individual Recovery Plan that did not state

4

when Hagan could return to Phase 1. (Doc. 27 ¶ 17; Doc. 51 ¶ 17; Doc. 27 at 36-37). On June 6, 2019, defendant Contreras responded to Hagan in a "Remanded Initial Review Response" based on a grievance he filed against defendant Stetler. (Doc. 27 ¶ 18; Doc. 51 ¶ 18; Doc. 27 at 22). Defendant Contreras advised Hagan that "At no time were you placed back in Phase 4. As of this date, June 6th, 2019 you were released back to General Population." (Doc. 51 ¶ 18; Doc. 27 at 22). Hagan asserts that the document was false. (Doc. 27 ¶ 18).

In May 2020, Hagan appeared before the Parole Board and was denied parole based on his reported misconducts, his level of risk to the community, and the negative recommendation made by the Department of Corrections ("DOC"). (Doc. 27 ¶¶ 19, 20; Doc. 51 ¶¶ 19, 20; Doc. 27 at 38-39). Hagan contends that the DOC issued a negative recommendation because he "needed a longer period of adjustment" and must be misconduct free. (Doc. 27 ¶ 21).

DC-ADM 801, Section 2. C. 4 states: "For the purpose of parole and the Pennsylvania Additive Classification Tool (PACT), informal resolutions are not considered misconducts, but should be reflected on applicable block and work reports." (Doc. 27 ¶ 22; Doc. 51 ¶ 22; Doc. 27 at 48).

When considering misconducts, the Parole Board concentrates on those that occurred within the prior two years. (Doc. 27 ¶ 23; Doc. 51 ¶ 23; Doc. 27 at 63-64).

**C.     Material Facts Regarding Causation**

Hagan avers that he received a false misconduct on February 12, 2019, seven days after defendants Banta and Stetler became aware that Hagan filed three meritorious grievances. (Doc. 27 ¶ 24). In response, defendants maintain that the

5

misconducts were not false and there is no evidence that Banta and Stetler were aware of his previously filed grievances. (Doc. 51 ¶ 24). Hagan further avers that defendants Banta and Stetler kept him in the BMU despite establishing his innocence on February 13, 2019, eight days after they were made aware that Hagan had filed three meritorious grievances. (Doc. 27 ¶ 25).

On March 27, 2019, the PRC reviewed Hagan's case and placed him back in Phase 4, one day after he filed grievances against staff. (Doc. 27 ¶ 26; Doc. 51 ¶ 26). The PRC also determined that Hagan's disciplinary custody release date is August 16, 2027. (Doc. 27 ¶¶ 27, 29; Doc. 51 ¶¶ 27, 29). Defendants maintain that the PRC made these decisions after considering that Hagan received 228 misconducts since the initial misconduct. (Doc. 51 ¶ 26; Doc. 27 at 33). On March 27, 2019, Hagan was placed back in Phase 4. (Doc. 27 ¶ 28; Doc. 51 ¶ 28). The parties dispute whether such placement was retaliatory. (Id.)

Hagan contends that on March 25, 2019, defendant Mason stated that Hagan was being subjected to the formal process, and other inmates were not, was because he filed grievances. (Doc. 27 ¶ 31). Defendants deny that Mason ever made such a statement. (Doc. 51 ¶ 31).

On May 7, 2019, Hagan filed an inmate request to staff wherein he alleged that staff refused to put time parameters in his Individual Treatment Plan and changed the decision to release him back to general population based on his filing of grievances. (Doc. 27 at 67). The parties dispute whether defendant Mason accepted these allegations. (Doc. 27 ¶ 32; Doc. 51 ¶ 32). In the request slip, Hagan stated that he would work with staff and would not file any more grievances if his

6

treatment plan indicated when he would be placed back in general population. (Doc. 27 ¶ 33; Doc. 51 ¶ 33; Doc. 27 at 68).

On May 22, 2022, defendants Stetler, Banta, and Mason reviewed Hagan's disciplinary custody and did provide time parameters as to when he would be released back to general population.  (Doc. 27 ¶ 34; Doc. 51 ¶ 34; Doc. 27 at 72).

Hagan states that he did not file any grievances or civil actions from May 22, 2019 through July 2019, when he graduated from the BMU Program.  (Doc. 27 ¶ 35). In response, defendants provide that Hagan filed a grievance during this time— grievance number 813085 on July 19, 2019.  (Doc. 51 ¶ 35; Doc. 52-3).

On February 13, 2019, Hagan appeared before defendants Stetler and Banta to determine if he would be continued in Administrative Custody.  (Doc. 27 ¶ 36; Doc. 51 ¶ 36; Doc. 27 at 30).

The DOC does not hold inmates in Administrative Custody if the inmate has disciplinary time.  (Doc. 27 ¶ 37; Doc. 51 ¶ 37).  DC-ADM 13.8.1, Section 12.A.2. states, in part: "An inmate's custody level will be suspended while in the BMU but their Disciplinary Custody (DC) sanctions, if they have any, will run concurrent to their time in the BMU until the sanction expires or until placed in Phase 1 of the program."  (Doc. 27 ¶ 38; Doc. 51 ¶ 38; Doc. 27 at 74).  In December 2018, Hagan was placed into Phase 1.  (Doc. 27 ¶ 39; Doc. 51 ¶ 39).

On August 19, 2020, Hagan received a document from his counselor, who is trained in DOC Policy, acknowledging that he is not considered DC time while in Phase 1.  (Doc. 27 ¶ 40; Doc. 51 ¶ 40; Doc. 27 at 82).

7

**D.     Material Facts Showing that Defendants Cannot Prove by a Preponderance of the Evidence that they Would Have Taken the Same Actions Absent the Protected Conduct**

The parties dispute whether Hagan presented a document to defendants Banta, Stetler, and Miller on February 1, 2019 showing that Chaplain Germer requested a one-on-one meeting with Hagan. (Doc. 27 ¶ 41; Doc. 51 ¶ 41). On February 12, 2019, Hagan's misconduct, charging him with lying to an employee, was dismissed with prejudice. (Doc. 27 ¶ 42; Doc. 51 ¶ 42; Doc. 27 at 17).

Hagan contends that defendants Banta, Stetler, and Miller did not conduct any investigation regarding the history between Hagan and Chaplain Germer. (Doc. 27 ¶ 43). In response, defendants submitted an excerpt from the Inmate Cumulative Adjustment Records which provides that the matter was investigated. (Doc. 51 ¶ 43; Doc. 52-4).

Hagan avers that he was never issued any misconducts pertaining to Chaplain Germer. (Doc. 27 ¶ 44). Defendants respond that on February 12, 2019, Hagan was issued misconduct number D050031 for lying to an employee when he told an officer that he had a scheduled one-on-one meeting with Chaplain Germer. (Doc. 51 ¶ 44; Doc. 27 at 17). The officer contacted the chapel and was informed that they were unaware of any such meeting. (Id.) On February 14, 2019, a disciplinary hearing was held, and the charge was dismissed with prejudice. (Id.).

Hagan contends that after he was released back to general population, Chaplain Germer continued to call him for a one-on-one meeting every Monday. (Doc. 27 ¶ 45). Defendants deny this statement and further state that this fact is immaterial because Chaplain Germer is not a party to this action. (Doc. 51 ¶ 45).

On March 26, 2019, a hearing examiner dismissed charge 15—threatening an employee. (Doc. 27 ¶ 46; Doc. 51 ¶ 46; Doc. 27 at 85-87). The parties dispute whether Hagan was subjected to isolation as a result of the misconduct. (Id.)

DC-ADM 801, Section 1.b.4.b. states, in part: "If the inmate is a juvenile or carried on the active MH/ID Roster and the misconduct is non-violent in nature (i.e., misconduct charges #26 to #52) the Shift Commander will refer the misconduct for informal resolution." (Doc. 27 ¶ 47; Doc. 51 ¶ 47; Doc. 27 at 44). Hagan was on the active mental health roster. (Doc. 27 ¶ 48; Doc. 51 ¶ 48). Hagan contends that, in accordance with DC-ADM 801, Section 2, staff is not authorized to place him in isolation if he is found guilty of charges #26 to #52. (Doc. 27 ¶ 49; Doc. 27 at 85-87). Defendants deny this statement and assert that, in accordance with DC-ADM 801, Section 3-Misconduct Hearings, subsection A.4, the Hearing Examiner is solely responsible for decisions of credibility and guilt or innocence, and any sanction is to be decided by the Hearing Examiner. (Doc. 51 ¶ 49).

Hagan contends that DC-ADM 13.8.1, Section 12.Q, which covers misconducts, only authorizes action if the inmate is found guilty of charges #1-14 or #15-25. (Doc. 27 ¶ 50; Doc. 27 at 80). In response, defendants assert that Hagan may be sanctioned for committing any misconduct. (Doc. 51 ¶ 50).

DC-ADM 13.8.1, Section 12.O, which covers phase modifications, states in part: "The modifications will be documented on the IRP with the rationale and goals for the modification and the steps to taken to reach those goals." (Doc. 27 ¶ 51; Doc. 51 ¶ 51).

DC-ADM 13.8.1, Section 12.L.4. states, in part: "The length of time spent in each phase is dependent on the inmate's demonstrated level of adjustment. The specific time parameters for each phase movement will be defined in the inmate's IRP." (Doc. 27 ¶ 52; Doc. 51 ¶ 52).

DC-ADM 13.8.1, Section 12.S states that Phase 1 constitutes a release from the BMU and there is nothing within the subsection that authorizes staff to reissue disciplinary time that has been resolved. (Doc. 27 ¶ 53; Doc. 51 ¶ 53).

DC-ADM 13.8.1, Section 12.A states, in part: "An inmate's custody level will be suspended while in the BMU but their Disciplinary Custody (DC) sanctions, if they have any, will run concurrent to their time in the BMU until the sanction expires or until placed in Phase 1 of the Program." (Doc. 27 ¶ 54; Doc. 51 ¶ 54; Doc. 27 at 74).

Hagan now moves for partial summary judgment on counts I, IV, and V of the complaint. (Doc. 26). The motion is fully briefed and ripe for resolution.

## II. **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's

favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

### III. Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  See 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

The First Amendment offers protection for a wide variety of expressive activities.  See U.S. CONST. amend I.  To prevail on a retaliation claim, Hagan must demonstrate that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action at the hands of prison officials; and (3) his

11

constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (citing Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001)). An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights. Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000) (quoting Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)). Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a causal link. Id. (citing Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).

Once a plaintiff has established that he was subjected to a retaliatory disciplinary measure, the burden shifts to the defendants to demonstrate by a preponderance of the evidence that they would have made the same penological decision absent the protected conduct. Rauser, 241 F.3d at 330. This determination requires the court to "evaluate 'the quantum of evidence'" in support of the misconduct "to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them." Watson, 834 F.3d at 426. If the evidence supporting the disciplinary offense is "clear and overt," the court should conclude that prison officials would have made the same decision to impose the disciplinary measure regardless of the inmate's protected activity. See id.

### A.     Count I against Defendants Stetler, Banta, and Miller

In count I of the complaint, Hagan asserts that defendants Stetler, Banta, and Miller retaliated against him by converting a false misconduct from informal resolution to a formal misconduct. (Doc. 1 ¶ 39).

Before reaching the substantive merits of this claim, defendants Stetler and Banta direct the court to the lack of evidence connecting them to the alleged issuance of a false misconduct. (Doc. 57 at 10-11). Individual liability can be imposed under 42 U.S.C. § 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)); Sutton v. Rasheed, 323 F.3d 236, 249-50 (3d Cir. 2003). The personal involvement of a defendant in a § 1983 action may be shown "through allegations of personal direction or of actual knowledge and acquiescence." Argueta v. U.S. ICE, 643 F.3d 60, 72 (3d Cir. 2011) (quoting Rode, 845 F.2d at 1207). Such allegations, however, must be made with appropriate particularity in that a compliant must allege the "conduct, time, place, and persons responsible." Evancho, 423 F.3d at 354; Rode, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. Rode, 845 F.2d at 1208. Moreover, a defendant "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." C.H. ex rel. Z.H. v. Olivia, 226 F.3d 198, 201-202 (3d Cir. 2000). Allegations that a supervisor "had constructive knowledge of a subordinate's

unconstitutional conduct simply because of his role as a supervisor" do not suffice. Broadwater v. Fow, 945 F.Supp.2d 574, 588 (M.D. Pa. 2013) (citing C.H. ex rel. Z.H., 226 F.3d at 202). Additionally, simply responding to a grievance or receiving a letter or request slip from an inmate is insufficient to satisfy the personal involvement requirement. Mincy v. Chmielsewski, 508 F. App'x 99, 104 (3d Cir. 2013).

Hagan admits that defendant Grohowski wrote the misconduct, not defendants Stetler or Banta, and that defendant Miller instructed Grohowski to issue the misconduct against him. (Doc. 1 ¶¶ 11, 13). The evidence confirms that on February 12, 2019, Correctional Officer Bobrowski[2] issued a misconduct against Hagan charging him with lying to an employee. (Doc. 27 ¶ 10; Doc. 51 ¶ 10; Doc. 27 at 27). The matter was referred to the PRC due to the seriousness of the offense. (Doc. 27 at 27). On February 13, 2019, Hagan appeared before defendants Stetler, Banta, and Miller for an Administrative Hearing to determine whether he would remain in Administrative Custody. (Doc. 27 at 30). At the hearing, Hagan stated that he was written up for a false misconduct. (Id.) Defendants Stetler, Banta, and Miller determined that Hagan would continue in the same status, pending a misconduct hearing. (Id.) On February 14, 2019, Hagan appeared before a Hearing Examiner, and the misconduct was dismissed with prejudice. (Id. at 17). The complaint lacks any factual averments that defendants Stetler or Banta were involved in issuing the false misconduct; instead, they were members of the committee that held an Administrative Hearing. (Doc. 1 ¶ 11, 13). The summary

---

[2] The court presumes that Correctional Officer Bobrowski is incorrectly identified in the pleadings as defendant Grohowski.

judgment record similarly fails to connect either of these defendants to this claim. In the absence of any evidence that either defendants Stetler or Banta played an affirmative role in issuing the alleged false misconduct, summary judgment must be denied.

Assuming *arguendo* that defendants Stetler and Banta were personally involved, it is well-settled that retaliation claims can be based upon alleged retaliation against an inmate due to his filing of grievances against prison officials. See Kelly v. York Cty. Prison, 340 F. App'x 59, 61 (3d Cir. 2009) ("[t]he filing of grievances is protected under the First Amendment."). However, in this context it is essential that the plaintiff show that the defendants knew of the grievance at the time they took the allegedly retaliatory actions. Here, the parties dispute whether defendants Stetler and Banta knew that Hagan had previously filed grievances. (Doc. 27 ¶¶ 8, 24; Doc. 51 ¶¶ 8, 24).

With respect to the second element, there is little doubt that placement for two days in a cell contaminated with feces, dried blood, and OC residue is an adverse action. However, defendants refute these claims and submit that Hagan was placed in cell GA 1008 on February 12, 2019, the cell was cleaned thoroughly and painted on February 8, 2019, and no inmate was housed in that cell from February 8, 2019 to February 12, 2019, when Hagan was placed in the cell. (Doc. 51 ¶ 11; Doc. 52-2). The factual dispute over the condition of the cell is a material issue which precludes summary judgment on this claim. With that said, the court does not reach the third element of whether Hagan has established a causal link between the exercise of his constitutional rights and the adverse action taken against him.

15

Defendants next raise a qualified immunity defense. In order to establish a civil rights claim, Hagan must show the deprivation of a right secured by the United States Constitution or the laws of the United States. However, government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009). A qualified immunity determination involves a two-pronged inquiry: (1) whether a

16

constitutional or federal right has been violated; and (2) whether that right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first).

Hagan's claims relate to alleged retaliation that occurred in February 2019. It is clearly established that grievance-related activity is constitutionally protected conduct. See Kelly, 340 F. App'x at 61. However, the law is unsettled as to whether the placement of an inmate in a dirty, unsanitary cell for several days constitutes an adverse action for the purposes of a retaliation claim. But some federal courts have recognized that subjecting an inmate to similarly unsanitary conditions was sufficient to deter a person of ordinary fitness from exercising his constitutional rights. See, e.g., Thaddeus-X v. Blatter, 175 F.3d 378, 403 (6th Cir. 1999) (holding that placement in an area of the prison used to house mentally disturbed inmates combined with harassment and physical threats could constitute a sufficient adverse action for retaliation purposes). We find a genuine dispute of material fact with respect to whether it would have been clear to a reasonable prison official that placement of an inmate in a cell under such conditions would be sufficient to constitute an adverse action. Under the circumstances presented in this case, we find that defendants are not entitled to qualified immunity from monetary damages with respect to this retaliation claim.

### B. Count IV against Defendants Stetler and Banta

In count IV of the complaint, Hagan asserts that defendants Stetler and Banta retaliated against him by placing him back in Phase 4 of the BMU. (Doc. 1 ¶

42). Defendants respond that Hagan's failure to progress through the program is not an adverse action. (Doc. 57 at 19-20).

As stated *supra*, the filing of a grievance implicates conduct protected by the First Amendment. See Watson, 834 F.3d at 422. However, the parties dispute whether defendants Stetler and Banta knew that Hagan had previously filed grievances. (Doc. 27 ¶¶ 8, 24; Doc. 51 ¶¶ 8, 24).

With respect to the second element of a retaliation claim, the parties dispute whether Hagan suffered an adverse action when he was demoted in the BMU program. On March 27, 2019, the PRC reviewed Hagan's case and placed him back in Phase 4, one day after he filed grievances against staff. (Doc. 27 ¶ 26; Doc. 51 ¶ 26). The PRC also determined that Hagan's disciplinary custody release date is August 16, 2027. (Doc. 27 ¶¶ 27, 29; Doc. 51 ¶¶ 27, 29). The parties disagree as to whether the demotion in the program stemmed from retaliatory animus and, if so, whether the PRC decision was independently supported by the evidence. (Doc. 27 ¶ 26; Doc. 51 ¶ 26). After carefully reviewing the record, the court concludes that there are disputed material facts underpinning each of these issues. Summary judgment on this retaliation claim against defendants Stetler and Banta must be denied.

**C.   Count V against Defendants Mason, Stetler, and Banta**

In count V of the complaint, Hagan asserts that defendants Mason, Stetler, and Banta retaliated against him by falsifying a document showing that he had disciplinary time until August 2027, which interfered with his parole status. (Doc. 1 ¶ 43).

Again, Hagan was engaged in the constitutionally protected activity by filing grievances.  See Watson, 834 F.3d at 422.  With respect to the second Rauser element, over-sanctioned disciplinary custody time can constitute an adverse action.  However, defendants argue that Hagan has not demonstrated a causal connection between this action and his act of filing grievances.  (Doc. 57 at 20-23).  Defendants assert that the extension of Hagan's disciplinary time was the product of his own bad behavior and illicit activity, including receiving 228 misconducts since 2005.  (Id. at 21).  The court concludes that there are genuine issues of material fact as to whether defendants retaliated against Hagan for filing grievances by extending his disciplinary custody time.  Accordingly, the motion for summary will be denied as to this retaliation claim.

**IV.     Conclusion**

We will deny Hagan's motion (Doc. 26) for summary judgment. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:      September 30, 2021